UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————

JOHNNIE O'NEAL,

                    Plaintiff,                14-cv-7649 (JGK)

          - against -                         OPINION AND ORDER

THE CITY OF NEW YORK, NEW YORK CITY
HOUSING AUTHORITY, and JOSE MORALES,
Individually,

                    Defendants.
———————————————————————————

JOHN G. KOELTL, District Judge:

        Johnnie O'Neal brings this action against the City of New

York (the "City"), the New York City Housing Authority

("NYCHA"), and Jose Morales, alleging violations of his rights

under 42 U.S.C. § 1983. O'Neal was arrested and convicted in

1985 of rape in the first degree in violation of New York Penal

Law § 130.35 and robbery in the first degree in violation of New

York Penal Law § 160.15. He was imprisoned for more than

thirteen years. In 2008, the Legal Aid Society investigated the

validity of O'Neal's conviction, and in 2010, the New York City

District Attorney ("NYCDA") conducted an investigation that

called into question O'Neal's conviction. In 2013, a state court

issued an order vacating O'Neal's rape and robbery convictions

pursuant to New York Criminal Procedure Law § 440.10(1)(g).

        On September 19, 2014, O'Neal filed this lawsuit, and filed

an Amended Complaint on September 14, 2015. O'Neal asserted

violations of 42 U.S.C. § 1983 against: (1) Jose Morales, the

1

New York City detective who investigated the alleged rape and robbery, for malicious prosecution, Amended Compl. ¶¶ 77-86 (First Cause of Action); (2) Morales for violating O'Neal's right to a fair trial by allegedly providing false information to the prosecutor, Amended Compl. ¶¶ 87-91 (Second Cause of Action); (3) against the City of New York for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978) for the actions of the NYCDA arising from alleged violations of Brady v. Maryland, 373 U.S. 83 (1963) by the state prosecutor, Amended Compl. ¶¶ 92-119 (Third Cause of Action); and (4) against the NYCHA for municipal liability for the actions of the New York City Housing Authority Police Department ("NYCHAPD"), Amended Compl. ¶¶ 120-31 (Fourth Cause of Action). On November 9, 2015, the defendants moved to dismiss the Amended Complaint. O'Neal voluntarily withdrew the malicious prosecution claim against Morales (First Cause of Action) and the municipal liability claim against the NYCHA (Fourth Cause of Action). Pl.'s Opp. at 1. For the reasons explained below, the defendants' motions are granted.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d

2

Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002).

II.

The following facts alleged in the Amended Complaint are accepted as true for the purposes of the defendants' motions to dismiss.

On January 29, 1985, O'Neal was convicted of rape in the first degree and robbery in the first degree. Amended Compl. ¶ 13. The crime for which O'Neal was arrested and convicted occurred on March 16, 1984. Id. ¶ 21. At approximately 11:00 p.m., on March 16, 1984, a woman referred to as M.R. was raped and robbed on the roof of her apartment building at 865 Columbus Avenue. Id. ¶ 22. When M.R. attempted to leave the elevator in her apartment building, a man threatened her with a knife and stole her money and jewelry. He proceeded to force M.R. to the roof where he ordered M.R. to the floor, covered her face, removed her clothing, and raped her. Id. M.R. described her assailant as a thin, African American man in his 20s. Id. She did not indicate that her assailant lived in her building or that he had a mustache or missing front tooth. Id. In the months preceding the March 1984 rape, three other rapes occurred, two on the rooftop of 865 Columbus Avenue and one across the street at 830 Columbus Avenue. Id. ¶ 17. The three prior rapes occurred after midnight and shared similar characteristics—namely, the victim was intercepted in the elevator and threatened with either a gun or a knife, robbed of valuables, forced to the

4

roof, and raped. Id. ¶¶ 18-20. The victims identified their respective attackers as a thin, African American male. The ages ranged from 28-30 to 28-29 to early 20s. Id.

Jose Morales, a detective in the New York Police Department, was assigned to investigate the rape of M.R. He allegedly noted that the rapist had the "same M.O. and dialogue" as and was described similarly to the assailants in the three other rapes. Id. ¶¶ 23-24. On March 27, 1984, Morales interviewed M.R.'s mother, B.M., who told Morales that six days earlier, B.M. and M.R. had identified O'Neal as the rapist. Id. ¶ 27. B.M. told Morales that on March 21, 1984, M.R. told B.M. that she saw her rapist from the window of her apartment on the 10th floor. Id. ¶ 28. B.M. told Morales that B.M. followed the person M.R. identified for six hours and that he returned to 865 Columbus Avenue. Id. B.M. told Morales that B.M. called M.R. from a pay phone and told her to come downstairs to identify the person B.M. had been following. B.M. told Morales that M.R. confirmed that the person was her assailant and that B.M. followed the person to the elevator and saw him go into an apartment on the 5th floor. Id.

M.R. also told Morales that she saw a person she believed to be her assailant from her 10th floor window on March 20, 1984, and again on March 21, 1984, when she told her mother. Id. ¶ 29. The Amended Complaint alleges that Morales had reasons to

doubt the truthfulness and reliability of the identification by
B.M. and M.R. because, among other things, B.M. and M.R. never
mentioned that the assailant lived in their building and that he
had a missing tooth and mustache like O'Neal. Id. ¶ 30.

M.R. and B.M. identified O'Neal as the assailant on March
31, 1984, in a photo array. Id. ¶ 31. O'Neal was arrested the
next day, on April 1, 1984. Id. ¶ 35. On April 2, 1984, Morales
swore to a criminal court complaint filed in New York County
Criminal Court. The complaint initiated the prosecution against
O'Neal. Id. ¶ 37. At O'Neal's arraignment, the NYCDA informed
the court that O'Neal was a suspect in the other three rapes.
Id. ¶ 37. O'Neal was unable to post bail. Id. O'Neal was
indicted by a grand jury. Id. ¶ 38.

Before July 2, 1984, an unidentified police officer placed
O'Neal's photograph in a photo array and displayed it to C.H.,
the victim of one of the other three rapes. C.H. stated that she
did not see her assailant in the array, and that she knew O'Neal
and O'Neal was not the person who had raped her. Id. ¶¶ 40-41.
The police officer allegedly verbally informed the assistant
district attorney ("ADA") assigned to prosecute O'Neal that C.H.
had exculpated O'Neal. Id. ¶ 42.  O'Neal was also placed in a
lineup for another one of the rapes, and the victim did not
identify him as the assailant. Id. ¶ 43. On July 2, 1984, the
NYCDA notified O'Neal and the state court that O'Neal had not

been identified by the other rape victims. Id. ¶ 44. O'Neal's bail was reduced. O'Neal posted bail and was released. Id. ¶ 45.

Approximately two weeks before the trial against O'Neal which commenced on January 18, 1985, the ADA assigned to O'Neal's case requested that Morales visit M.R.'s 10th floor apartment to determine if facial features of individuals on the street could be discerned from the window. Id. ¶ 48. Morales allegedly informed the ADA before the trial that he verified that facial features were discernable from the 10th floor window. Id. ¶ 49. During O'Neal's trial, Morales testified that he could see people's faces on the street from M.R.'s window on the 10th floor. Id. ¶ 51. M.R. and B.M. also testified at trial. Id. According to the Amended Complaint, Morales "created false evidence . . . and forwarded that false evidence to the NYCDA" and "used false evidence against [O'Neal] in legal proceedings." Id. ¶¶ 88-89. The only "fake evidence" that O'Neal has identified in Morales's testimony and statement to the ADA was that he could see people's faces from M.R.'s 10th floor window.

On January 29, 1985, O'Neal was convicted of first degree rape and first degree robbery. Id. ¶ 53. O'Neal was sentenced to a prison term of ten to twenty years, and served approximately thirteen years and nine months before being paroled in 1998. Id. ¶ 54. O'Neal was subsequently imprisoned again for more than two years for parole violations. Id. ¶ 55. O'Neal was also

required to register as a sex offender. Id. ¶ 56. The Amended Complaint alleges that in the years following his conviction, the NYCDA continued to withhold from O'Neal C.H.'s statement exculpating O'Neal as the perpetrator of C.H.'s rape. Id. ¶ 60.

In 2008, the LAS commenced an investigation into O'Neal's criminal convictions. The LAS investigation included an interview of B.M. who admitted that she suspected O'Neal because she believed O'Neal had raped another woman in the same building. B.M. denied following O'Neal for six hours to learn his identity. Id. ¶ 62. The Conviction Integrity Panel of the NYCDA reinvestigated O'Neal's conviction at his request in October 2010. The NYCDA confirmed that M.R. and O'Neal had lived in the same building for over six years prior to the attack. Id. ¶ 67. The NYCDA also interviewed M.R. who stated she did not have any recollection of identifying her attacker from the 10th floor window or of her mother's following the attacker. Id. ¶ 66. The NYCDA investigators also determined that they could not see facial features from the 10th floor window. Id. ¶ 65. The re-investigation also uncovered evidence that another person confessed to the rape of M.R. and could also have committed the other three rapes. Leventhal Decl., Ex. C at 17-19, 24.

On May 28, 2013, O'Neal moved for an order vacating the judgment of conviction and dismissing the indictment for his convictions. The NYCDA joined the application. Amended Compl.

¶ 69. On June 21, 2013, the Honorable Marcy L. Kahn issued an order vacating O'Neal's rape and robbery convictions and dismissing the underlying indictment with prejudice. Id. ¶ 70.

The Amended Complaint alleges that the NYCDA, an agency of the City of New York, had a policy of "deliberate, reckless, or negligent withholding of exculpatory evidence." Id. ¶¶ 71-72, 92-94. The Amended Complaint sets out a list of cases where a NYCDA conviction was overturned or an indictment was dismissed based on the failure to disclose exculpatory evidence. Id. ¶ 74.

### III.

The gist of O'Neal's claims against Morales is that Morales lied to the prosecutor about being able to discern faces from M.R.'s 10th floor window, and that Morales's statements led the ADA to prosecute O'Neal for a rape he did not commit. O'Neal also argues that Morales should have known that the identifications by M.R. and B.M. were unreliable and suspicious. O'Neal's Monell claim against the City of New York is based on the claim that, in violation of Brady obligations, the ADA did not disclose to O'Neal that C.H. said O'Neal had not raped her. O'Neal argues that if O'Neal had known what C.H. said then he would have been able to show he did not commit the three other rapes, and thus, did not rape M.R.

The only remaining cause of action against Morales is a claim for deprivation of the right to a fair trial. "When a

police officer creates false information likely to influence a
jury's decision and forwards that information to prosecutors, he
violates the accused's constitutional right to a fair trial, and
the harm occasioned by such an unconscionable action is
redressable in an action for damages under 42 U.S.C. § 1983."
Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir.
1997); Jocks v. Tavernier, 316 F.3d 128, 138 (2d. Cir. 2003);
Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir.
2012) (summary order).

O'Neal alleges that Morales "fabricated evidence when he
falsely reported back to the ADA that he was personally able to
discern facial features" from the 10th floor window of M.R.'s
apartment. Pl.'s Opp. at 15.[1] The defendants argue that absolute
immunity protects Morales's testimony at trial and that any
statement by Morales to the ADA was made in preparation for his
trial testimony and is protected by absolute immunity.

---

[1] The Amended Complaint alleged that Morales should have known that M.R.'s
identification was unreliable because she did not mention that her attacker
had a mustache or missing tooth, two features that O'Neal had at the time,
that Morales should have known that the facts of B.M.'s identification were
unreliable and suspicious, that Morales failed to disclose C.H.'s allegedly
exculpatory statement, that Morales informed the ADA that he had verified
that people's faces were discernable from the 10th floor apartment, and that
Morales testified at trial that he could see faces from the 10th floor
window. In his brief in opposition to the motion to dismiss, O'Neal clarifies
that his fair trial claim is based *only* on allegations pertaining to
Morales's statement to the ADA that he could see faces from the 10th floor
window. O'Neal states that the right to a fair trial claim is *not* based on
Morales's failure to disclose C.H.'s allegedly exculpatory statement or on
Morales's failure to ascertain that M.R.'s and B.M.'s identification was
unreliable. Pl.'s Opp. at 17 n.8.

In Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983) and Rehberg v. Paulk, 132 S. Ct. 1497, 1505 (2012), the Supreme Court extended absolute immunity to testimony in trial and grand jury proceedings and immediate preparations for such proceedings. As the Supreme Court explained in Briscoe, citing Judge Learned Hand, "'In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'" Briscoe, 460 U.S. at 345 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)). Therefore, to the extent that O'Neal alleges that Morales deprived him of the right to a fair trial by testifying at trial that Morales could see people's faces from the 10th floor window, Morales has absolute immunity for his testimony. See id.[2]

However, O'Neal argues that his fair trial claim is based on Morales's statement to the ADA, not on Morales's trial testimony. O'Neal points out that the Court of Appeals for the Second Circuit noted in Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015) that a police officer does not enjoy absolute immunity if a plaintiff can make out the elements of a § 1983 claim without resorting to privileged testimony. Id. at 113.

---

[2] Morales testified at O'Neal's trial that he looked out the window of M.R.'s apartment and could see people below on the street, including people's faces. Lawless Decl., Ex. C at 102-03.

Absolute immunity does not "extend[] to *all* activity that a witness conducts outside of the grand jury room" and only qualified immunity would protect law enforcement officials who falsify affidavits or fabricate evidence. Rehberg, 132 S. Ct. at 1507 n.1. But statements made to a district attorney that are "preparatory activity" in advance of the defendant's grand jury testimony are entitled to absolute immunity. Coggins, 776 F.3d at 113 n.7. "Coggins, then, effectively requires a court considering a claim of denial of fair trial based upon statements (rather than physical evidence) to distinguish between preparatory activity and pre-preparatory activity in determining absolute immunity." Rucks v. City of New York, 96 F. Supp. 3d 138, 149 (S.D.N.Y. 2015).

O'Neal argues that Morales's allegedly false statement made prior to his trial testimony and in response to the ADA's request to investigate M.R.'s identification from her 10th floor window are actionable under Coggins because the statement did not constitute preparatory activity in anticipation of Morales's trial testimony. The Amended Complaint alleges that Morales went to M.R.'s building at the request of the ADA. Morales went to the building two weeks before the trial, and almost ten months after O'Neal was originally indicted. Amended Compl. ¶ 48. O'Neal alleges, based on the NYCDA reinvestigation which "confirmed that M.R., B.M., and defendant MORALES all lied when

12

they testified during O'NEAL's criminal trial that facial features were discernable from M.R.'s 10th floor window," that Morales fabricated evidence by telling the prosecutor he could see people's faces when in reality he could not. See id. ¶ 65.[3]

O'Neal argues that Morales's visit to the apartment and observations were not part of preparing for his testimony. As pleaded in the Amended Complaint, Morales's statement to the prosecutor is protected by absolute immunity because it deals with the same content as his trial testimony. See Rehberg, 132 S. Ct. at 1506-07 (noting that absolute immunity for grand jury testimony would be frustrated if a plaintiffs "could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves" (internal quotation marks and citation omitted)). Preparatory activity includes for example, "preliminary discussion in which the witness relates the substance of his intended testimony." Id. at 1507; Bertuglia v. City of New York, 133 F. Supp. 3d 608, 642 (S.D.N.Y. 2015).

Morales's statement to the ADA was an out of court statement by a witness to a prosecutor shortly before trial.

---

[3] At the argument of the current motion, the plaintiff's counsel speculated that Morales did not actually go to M.R.'s building and that Morales fabricated his observations about being able to see faces from the 10th floor window. That speculation does not appear in the Amended Complaint. In any event, Morales's trial testimony is protected by absolute immunity. Moreover, it is useful to note that Morales affirmed that he could "see people's faces" on the street level, not that he could identify facial characteristics. Lawless Decl., Ex. C at 102-03.

Amended Compl. ¶ 49.  The statement to the prosecutor also allegedly mirrored his testimony at trial. Id. ¶¶ 49, 51. If the facts in the Amended Complaint were sufficient to defeat absolute immunity, absolute immunity would almost invariably be subject to challenge based on the witness's conversations with the prosecution prior to testifying --- precisely the danger the Supreme Court warned against. See Rehberg, 132 S. Ct. at 1507 ("In the vast majority of cases involving a claim against a [testifying] witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony.").

The cases that O'Neal cites in opposition to the motion to dismiss do not argue against absolute immunity for Morales in this case. The cases are distinguishable because the allegedly actionable statements or fabricated evidence in those cases predated the plaintiff's indictment and did not constitute activity that was preparatory to a defendant's protected trial or grand jury testimony. In Garnett, for example, absolute immunity did not shield the defendant's police report and criminal complaint which laid the groundwork for the plaintiff's prosecution. Garnett v. Undercover Officer C0039, No. 13-cv-7083 (GHW), 2015 WL 1539044, at *7-*8 (S.D.N.Y. Apr. 6, 2015); Garnett v. City of New York, No. 13-cv-7083 (GHW), 2014 WL

3950904, at *12-*13 (S.D.N.Y. Aug. 13, 2014). In <u>Rucks</u>, the plaintiff complained of allegedly false statements by officers to the ADA in police reports that allegedly persuaded the ADA to bring felony charges against the plaintiff and the statements occurred before the indictment. 96 F. Supp. 3d at 149-50. And in <u>Coggins</u>, the defendants' allegedly false police reports and statements to the district attorney predated the defendants' grand jury testimony and "laid the groundwork" for the plaintiff's indictment. 776 F.3d at 113; <u>see also</u> <u>Jones v. City of New York</u>, No. 13-cv-929 (ALC), 2016 WL 1322443, at *6 (S.D.N.Y. Mar. 31, 2016) (concluding that absolute immunity did not bar a malicious prosecution claim based on allegedly false reports that were created before the indictment); <u>Nnodimele v. Derienzo</u>, No. 13-cv-3461 (ARR) (RLM), 2016 WL 337751, at *11, *13-*14 (E.D.N.Y. Jan. 27, 2016) (the plaintiff alleged that police officers falsified and forwarded self-identification statements, misstated the defendant's height on police reports, and fabricated lineup identifications).

In this case, the statement by Morales was not a pre-indictment statement that laid the groundwork for O'Neal's prosecution. O'Neal was indicted 10 months prior to Morales's alleged statement to the ADA, and Morales went to M.R.'s apartment approximately two weeks before trial. It is unclear from the Amended Complaint when Morales informed the prosecutor

about his observations, but it is plain that the conversation occurred prior to his trial testimony. Amended Compl. ¶ 49. O'Neal does not allege that Morales's statement to the ADA about Morales's having "personally verified" that faces were discernable from the 10th floor "laid the groundwork" for O'Neal's indictment. Id.

The cases cited by O'Neal are distinguishable in another important respect-- the activities in those cases involved more than simple testimony and preparation for testimony. In Rucks and Garnett, the defendants had allegedly fabricated physical or documentary evidence that led to the plaintiff's arrest and participated in a larger scheme to frame the plaintiff. Rucks, 96 F. Supp. 3d at 150-51; Garnett, 2015 WL 1539044, at *7; see also Pizarro v. City of New York, No. 14-CV-507 (KAM) (VVP), 2015 WL 5719678, at *7 (E.D.N.Y. Sept. 29, 2015) ("Plaintiff alleges that Detectives Bey and Lundy coerced him to confess, and that plaintiff wrote down word-for-word the narrative dictated by the detectives. Thereafter, the detectives allegedly forwarded the information to prosecutors and plaintiff was remanded after his arraignment.").

The allegations in this case by contrast, show that the fair trial claim against Morales is based only on statements that he made to the prosecutor and about which he then testified under oath during the trial. As alleged in the Amended

16

Complaint, Morales's statement was prefatory to his testimony at trial. Absolute immunity in this case would not shield an otherwise actionable course of conduct merely because Morales testified about it at trial. See Fappiano v. City of New York, No. 01-cv-2476 (SLT)(SMG), 2015 WL 94190, at *20-*21 (E.D.N.Y. Jan. 7, 2015), aff'd, No. 15-260-CV, 2016 WL 860255 (2d Cir. Mar. 7, 2016); Rucks, 96 F. Supp. 3d at 150. But absolute immunity does shield Morales's statement to the prosecutor in preparation for his trial testimony. Accordingly, the motion to dismiss the fair trial claim against Morales must be granted because Morales is entitled to absolute testimonial immunity.

Morales is also entitled to absolute immunity because the challenged activity—going to M.R.'s apartment and making observations—was conducted to assist the prosecutor in his trial advocacy function and Morales's immunity is "coextensive with that of the prosecutor." City Reply at 3. A prosecutor has absolute immunity "for conduct in preparing for [the functions of initiating a prosecution and presenting a case at trial]; for example, evaluating and organizing evidence for presentation at trial or to a grand jury." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995). "[A] prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." Warney v. Monroe Cty., 587 F.3d 113, 123 (2d Cir. 2009).

A prosecutor's immunity can be extended to those acting at the prosecutor's direction. In <u>Hill</u>, the Court of Appeals concluded that a social worker and two other employees in the district attorney's office were "entitled to the same degree of immunity as [the assistant district attorney] himself for their activities while assisting with the investigation and prosecution" of a case. <u>Hill</u>, 45 F.3d at 660; <u>Davis v. Grusemeyer</u>, 996 F.2d 617, 631-32 (3d Cir. 1993), <u>overruled on other grounds</u> by <u>Rolo v. City Investing Co. Liquidating Tr.</u>, 155 F.3d 644 (3d Cir. 1998); <u>Goncalves v. Reynolds</u>, 198 F. Supp. 2d 278, 281-82 (W.D.N.Y. 2001) ("Likewise, an investigator or other nonjudicial officer is entitled to the same absolute immunity enjoyed by a prosecutor for acts that are (1) intimately related to the judicial process and (2) taken at the direction of the prosecutor.").

"In assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant, but not dispositive." <u>Deskovic v. City of Peekskill</u>, No. 07-cv-8150(KMK), 2009 WL 2475001, at *10 (S.D.N.Y. Aug. 13, 2009). Morales went to M.R.'s building at the request of the ADA, and spoke to the ADA about his observations only a few days before trial and several months after O'Neal had been indicted. <u>See</u> <u>id.</u> at *12. As alleged in the Amended Complaint, Morales's visit was intended to bolster and

18

corroborate the testimony of M.R. and B.M. Amended Compl. ¶ 51. It is evident that the visit and the allegedly false statements by Morales to the prosecutor were part of the prosecutor's advocacy function because Morales procured evidence for use by the state in the pending trial. See Deskovic, 2009 WL 2475001, at *14. Therefore, Morales also has absolute prosecutorial immunity for his conversation with the ADA because Morales was acting at the prosecutor's direction in the course of preparing the case for trial, and absolute immunity bars the fair trial claim against Morales.[4]

## IV.

### A.

The plaintiff also brings a Monell claim against the City based on an alleged Brady violation by the ADA. O'Neal argues that the NYCDA and the ADA assigned to O'Neal's case never disclosed to O'Neal or to the court that upon viewing a photo array, C.H. said she knew O'Neal as someone who lived in her building and that O'Neal did not rape her, thereby exculpating O'Neal as her attacker. Amended Compl. ¶ 46. O'Neal admits that the NYCDA notified O'Neal "that O'Neal was not identified by the other rape victims." Id. ¶ 44. O'Neal contends that exculpatory

---

[4] It is unnecessary to reach the remaining arguments asserted by the defendants for dismissal of the claim against Morales.

evidence from C.H. would have established that because O'Neal was not C.H.'s assailant, he was also not M.R.'s assailant.[5]

To state a <u>Monell</u> claim, the plaintiff must plead facts showing a constitutional violation. <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986). Under <u>Brady</u>, "[t]he government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57 (1987) (citing <u>United States v. Agurs</u>, 427 U.S. 97 (1976), and <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (internal quotation marks omitted)); <u>see also</u> <u>Wolfson v. United States</u>, 907 F. Supp. 2d 418, 424-25 (S.D.N.Y. 2012). When a <u>Brady</u> violation is a component of a plaintiff's claim, the plaintiff must allege sufficient facts to assert a plausible claim that a <u>Brady</u> violation occurred. <u>See</u> <u>Delamota v. City of New York</u>, No. 14-cv-5888 (NG), 2016 WL

---

[5] At the argument of the current motion, the plaintiff conceded that the only basis for the <u>Monell</u> claim was the NYCDA's alleged <u>Brady</u> violation. There is no basis to conclude that Morales committed a <u>Brady</u> violation or that the police officer who conducted the photo array for C.H. committed a <u>Brady</u> violation. An officer's duty of disclosure requires disclosure to the prosecutor so that the prosecutor can assess the evidence and make necessary disclosures to the defense. <u>See</u> <u>Collins v. City of New York</u>, 923 F. Supp. 2d 462, 476 n.6 (S.D.N.Y. 2013). O'Neal does not argue or plead facts showing that the police officers failed to inform the ADA of C.H.'s statements.

3023267, at *7 (E.D.N.Y. May 24, 2016) (granting a motion to dismiss a Section 1983 claim and a <u>Monell</u> claim based on an alleged <u>Brady</u> violation because the plaintiff failed to plead a <u>Brady</u> violation); <u>Hadid v. City of New York</u>, No. 15-CV-19 (WFK)(RER), 2016 WL 1622888, at *5 (E.D.N.Y. Apr. 22, 2016) (denying a plaintiff's motion to amend because a plaintiff's <u>Monell</u> claims based on an alleged <u>Brady</u> violation were futile and would not withstand a motion to dismiss); <u>cf.</u> <u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) <u>aff'd</u>, 216 F.3d 1072 (2d Cir. 2000) (noting in the context of a habeas petition, that "[c]onclusory allegations that the government 'suppressed' or 'concealed' evidence" are insufficient to plead a <u>Brady</u> violation).

The defendants argue that the fact the prosecutors did not explicitly tell O'Neal that C.H. said O'Neal had not raped her was not a <u>Brady</u> violation. According to the Amended Complaint, the NYCDA told O'Neal that the three rape victims, other than M.R., had not identified O'Neal as their assailant. Amended Compl. ¶ 44.[6] Because the NYCDA informed O'Neal that he had not been identified as the perpetrator of the other rapes by the

---

[6] O'Neal was never indicted or tried for the other three rapes, and no evidence was introduced at trial about the other rapes. To the extent the City relies on a letter from O'Neal to C.H. as evidence that O'Neal knew C.H. and would have known that C.H. exculpated O'Neal as her assailant, that letter is not dispositive or necessary to the conclusion that there was no <u>Brady</u> violation. Stein Decl., Ex. A.

other victims, O'Neal knew that the other victims, including C.H., had not identified him as their attacker. He could have called the other victims as witnesses because he was told that they could not identify him as the assailant. O'Neal could have presented that information to the jury and argued that the fact the other victims did not identify them as their assailant showed that he was not responsible for M.R.'s rape. See United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987) ("[N]o Brady violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.").

O'Neal's argument that the NYCDA concealed that C.H. knew O'Neal and that information constituted Brady material is without merit. O'Neal was aware that he had not been identified as the attacker of the other victims. Amended Compl. ¶ 43. O'Neal could have called the other victims as witnesses as part of a trial strategy that attempted to show he did not commit other rapes that were similar to the rape of M.R. for which he was being tried. Whether O'Neal in fact knew C.H. and whether C.H. knew him was not itself material because O'Neal plainly knew of the existence of the other victims and that they had not identified him as their assailant, and these essential facts permitted him to investigate the non-identifications and if necessary, present this information at trial. See United States

v. Rigas, No. 02-cr-1236 (LBS), 2008 WL 144824, at *1-*2 (S.D.N.Y. Jan. 15, 2008), aff'd, 583 F.3d 108 (2d Cir. 2009).[7]

Moreover, it is important to note that the state court did not vacate the plaintiff's conviction and dismiss the indictment based on any finding of wrongdoing or any Brady violation by the prosecutor. Rather the court determined that there was "newly discovered evidence which, had it been introduced at trial, would likely have resulted in a verdict more favorable to the defendant." Leventhal Decl., Ex. C at 23. That evidence consisted of recantations by B.M. and M.R., the prosecution's two principal witnesses; evidence of how long M.R. had lived at 865 Columbus Avenue; and evidence that a third party confessed to M.R.'s rape and could have committed the other three rapes. Id. at 23-24.

Because the NYCDA's alleged conduct did not constitute a constitutional violation under Brady, the City cannot be held liable under Monell. See Heller, 475 U.S. at 799.

**B.**

O'Neal's Monell claim against the City also fails because O'Neal has not alleged facts showing that a City policy or custom, more than a single ADA's alleged failure to disclose C.H.'s statement, caused the alleged constitutional injury.

---

[7] The fact that O'Neal did not rape C.H., a rape as to which no evidence was presented at trial, did not itself show that O'Neal had not committed the M.R. rape.

The unconstitutional conduct of a single prosecutor does not give rise to municipal liability. City of Canton v. Harris, 489 U.S. 378, 386 (1989) ("Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on respondeat superior."). The unconstitutional conduct must rise to the level of a custom. "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials" and "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)(internal quotation marks and citations omitted); Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980) ("[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts."); see also Bertuglia, 133 F. Supp. 3d at 649-50.

O'Neal alleges that the City failed to provide adequate training, discipline, or supervision to the prosecutors at the

NYCDA. Among other things, O'Neal alleges that the NYCDA allowed prosecutors to violate their Brady obligations by refraining from disclosing the statements of witnesses that favored the accused. Amended Compl. ¶ 97. O'Neal alleges that the NYCDA had a policy of not memorializing exculpatory statements of witnesses and that this policy led to the prosecutor's failure to disclose Brady material in O'Neal's case. Id. ¶¶ 99, 103.[8] O'Neal further argues that the City failed to train state prosecutors to avoid Brady violations.

To plead a Monell claim based on a failure to train, a plaintiff must plead (1) that "a [municipality] knows 'to a moral certainty' that her employees will confront a given situation," (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Walker v. City of New York,

---

[8] The City submitted portions of the NYCDA's file on O'Neal. One of the notes stated that O'Neal was a suspect in three other cases and noted that one of the victims knew O'Neal from the building and said he was not her attacker. Wilson Decl., Ex. A. Another note said that C.H. knew O'Neal, that O'Neal was not C.H.'s attacker, and that O'Neal had written to C.H. from prison. Id., Ex. B. These notes cast substantial doubt on the plaintiff's contention that there was a practice of not recording allegedly exculpatory statements. O'Neal argued in anticipation of the City providing the notes that the official court records do not confirm that the NYCDA disclosed C.H.'s statement to O'Neal. For the purposes of the motion to dismiss, the Court takes as true O'Neal's allegations and does not rely on the NYCDA file.

974 F.2d 293, 297-98 (2d Cir. 1992). As the Supreme Court explained in Connick, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of a failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011); Bertuglia v. City of New York, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012).

There are insufficient allegations of a pattern of Brady violations in the Amended Complaint to survive the defendants' motion to dismiss. The Amended Complaint lists 26 court decisions allegedly showing that the NYCDA's office had a policy or custom of deliberate indifference to constitutional violations, particularly to Brady violations by prosecutors. However, almost all of these decisions—about 23—were decided after the events affecting O'Neal and thus, O'Neal cannot rely on them to plead that the City had notice of the alleged failure to train prosecutors to avoid Brady violations. See Collins, 923 F. Supp. 2d at 479. Even if the alleged violations in the cases cited by O'Neal occurred around the same time as O'Neal's criminal trial, the fact that those alleged violations did not come to light until many years after the alleged Brady violation in O'Neal's case undermines the argument that the City had notice of the NYCDA's constitutional violations. See Connick, 563 U.S. at 63 n. 7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide

'notice to the cit[y] and the opportunity to conform to constitutional dictates . . .'" (quoting Canton v. Harris, 489 U.S. 378, 395 (1989)).

Moreover, the remaining three court decisions from a time period preceding O'Neal's case are not sufficiently similar to the facts alleged in this case to show a pattern of similar violations necessary to give notice to the policymaker.[9] See Connick, 563 U.S. at 63 (noting that four cases involving Brady violations in ten years did not constitute a pattern because the cases did not share similar facts). The cases O'Neal cites broadly deal with Brady violations but would not have provided notice to the City of the need to train prosecutors in the NYCDA office to avoid Brady violations based on a failure to make a written record of an allegedly exculpatory statement by an individual during an identification procedure that did not testify at trial or witness the crime and to give the full statement to the defense. See New York v. Isla, 466 N.Y.S.2d 16, 17 (App. Div. 1983) (upholding the defendant's conviction but

---

[9] At the argument of the current motion the plaintiff mentioned two additional cases, New York v. Kitt, 450 N.Y.S.2d 319 (App. Div. 1982) and New York v. Grice, 591 N.Y.S.2d 380 (App. Div. 1992). These cases do not support the plaintiff's Monell claim and did not plausibly provide notice to the NYCDA of the alleged Brady violations in O'Neal's case. Kitt is dissimilar because the allegedly exculpatory evidence was a material forensic test the prosecutor failed to disclose at trial. Kitt, 450 N.Y.S.2d at 320-21. And like the 23 cases mentioned above, the failure to disclose the full details of a cooperation agreement in Grice occurred before O'Neal's conviction and cannot be used to show a pattern of Brady violations similar to the alleged violation in O'Neal's case.

admonishing the district attorney for not reporting the defendant's full statement to the Grand Jury); <u>New York v. Wallert</u>, 469 N.Y.S.2d 722, 724-25 (App. Div. 1983) (the prosecutor did not disclose that the complaining victim was about to file a civil action against her accused rapist which the defendant could have used to impeach the victim); <u>New York v. Hunter</u>, 480 N.Y.S.2d 1006 (Sup. Ct. 1984) (dismissing the indictment because the prosecutor failed to disclose the existence of an exculpatory witness to the defense which the defense could have presented to the grand jury). Accordingly, O'Neal has not pleaded the elements of a <u>Monell</u> claim because he has not pleaded a constitutional violation by the NYCDA and has not pleaded a pattern of violations necessary to make a failure to train claim. Therefore, the <u>Monell</u> claim against the City is dismissed.

**CONCLUSION**

The Court has considered all the parties' arguments. To the extent not specifically addressed above, the parties' arguments are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss are granted. The Clerk of Court is directed to enter judgment dismissing the Amended Complaint and closing this case and all pending motions.

**SO ORDERED.**
**Dated:**      New York, New York
              July 22, 2016

                              _____/s/_____

                                  John G. Koeltl
                          United States District Judge